# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.    '22 MJ01124
Meta Platforms, Inc., 1601 Willow Road, Menlo Park, CA, )
Instagram usernames "matthewtaylorcoleman" and )
"lovewater_surf" )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the     NORTHERN     District of     CALIFORNIA    , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1119, 1111 | FOREIGN MURDER OF U.S. NATIONALS |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA JOSEPH P. HAMER, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____TELEPHONE_____ *(specify reliable electronic means)*.

Date:  March 28, 2022

_____
*Judge's signature*

City and state:  SAN DIEGO, CA          Michael S. Berg
                                          DANIEL E. BUTCHER, U.S. MAGISTRATE JUDGE
                                          *Printed name and title*

## AFFIDAVIT

I, Joseph P. Hamer, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since May 1, 2016.  As a federal agent, I am empowered by United States law to conduct investigations regarding, and make arrests for, offenses enumerated in Title 18 of the United States Code. During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity, executed search and arrest warrants, and seized evidence of federal criminal violations.  Since April 1, 2019, I have been assigned to work violent crimes against children at the FBI's Ventura Resident Agency.  In this role, I am responsible for, among other things, enforcing federal criminal statutes involving the sexual exploitation of children.  I have received both formal and informal training from the FBI regarding computer-related investigations and computer technology.  My formal law enforcement training includes 21 weeks of education at the FBI Academy, where I took classes on writing affidavits and providing evidentiary testimony, among other topics.  Prior to my assignment at the Ventura Resident Agency, I was assigned to the Los Angeles Violent Crime Task Force.  As a member of this task force, I investigated various violent crimes, including bank robbery, extortion, kidnapping, and homicide.

2.   This affidavit supports an application by the United

States of America for a search warrant for Meta Platforms, Inc., headquartered at 1601 Willow Road, Menlo Park, California 94025 ("Meta"), to search the following online accounts:

a. Instagram username "matthewtaylorcoleman" ("SUBJECT ACCOUNT 1"), a personal account used by Matthew Coleman ("M. COLEMAN");

b. Instagram username "lovewater_surf" ("SUBJECT ACCOUNT 2"), a business account used by M. COLEMAN, collectively the ("SUBJECT ACCOUNTS") as described in Attachment A; for content and data from October 1, 2018 to August 10, 2021, for items that constitute evidence of violations of federal criminal law, namely, Title 18, United States Code, Sections 1119 and 1111: Foreign Murder of United States Nationals (the "SUBJECT OFFENSE") as described in Attachment B.  On September 8, 2021, a federal grand jury in the Southern District of California indicted M. COLEMAN for two counts of the SUBJECT OFFENSE.

3.    The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the

2

application for a search warrant, it does not set forth every fact that I or others have learned during this investigation.

## II. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   **A.C. Reported M. COLEMAN Missing.**

4.   On August 9, 2021, Sgt. Larson of the Santa Barbara Police Department ("SBPD") contacted FBI SA Jennifer Bannon regarding a possible parental kidnapping.  Sgt. Larson provided SA Bannon with a copy of a missing person police report that was taken by the SBPD.  I reviewed the police report and learned the following:

a.   On August 7, 2021, SBPD Officer Barriga spoke to A.C. via telephone regarding her husband, M. COLEMAN.  A.C. reported to SBPD that she, M. COLEMAN, and their two children, R.C. (10 months old) and K.C. (two years old),[1] planned to go on a camping trip.  Instead, A.C. said that M. COLEMAN had left their home in Santa Barbara, California (the "Coleman Residence") in the family's Mercedes Sprinter van with R.C. and K.C.  A.C. reported that M. COLEMAN did not tell her where he was going and was not answering her text messages. The officer attempted to contact M. COLEMAN via telephone but received no response.

b.   On August 8, 2021, A.C. called SBPD to follow up on the previous day's report.  SBPD Officer Michael Chung responded to the Coleman Residence and met with A.C., who

---

[1] According to R.C.'s birth certificate, she was born in September 2020.  According to K.C.'s birth certificate, he was born in October 2018.  Both were born in the United States and were U.S. citizens.  The time period requested under the warrant to search the SUBJECT ACCOUNTS begins the month of K.C.'s birth.

requested SBPD's assistance in reporting M. COLEMAN and their two children missing. Officer Chung asked A.C. whether she could attempt to use the "Find My iPhone" application to locate M. COLEMAN's phone. A.C. agreed and turned on a laptop, which showed that M. COLEMAN's last known location was in Rosarito, Baja California, Mexico at approximately 2:24 p.m.

**B. M. COLEMAN Is Located Returning from Mexico and R.C.'s and K.C.'s Bodies Are Found.**

5. On August 9, 2021, at about 11:50 a.m., Sgt. Larson, SBPD Detective Davis, and District Attorney Investigator (DAI) Aijian, went to the Coleman Residence where they met A.C.'s friends, T.C. and A.P., who explained that A.C. had just left for San Diego. T.C. and A.P. showed how they were using the Find My iPhone app on a MacBook Pro computer (the "MacBook") to track M. COLEMAN's iPhone movements in Mexico toward the San Ysidro Port of Entry ("SYPOE").[2]

6. A.P. and T.C. asked for help coordinating the search for M. COLEMAN, R.C., and K.C. A.P. and T.C. showed Det. Davis and DAI Ajian a text message from M. COLEMAN's iCloud account on the MacBook. The text message from M. COLEMAN to A.C. was sent on August 9, at 3:12 a.m., stating: "Hi babe, miss you too. Things have been rough but starting to get some clarity as well. Still confused on a lot of things though and processing through

---

[2] According to Det. Davis's report, A.P. identified the MacBook as belonging to M. COLEMAN and said A.C. was able to log in because she had his password. Later, A.P. provided the FBI with text messages between her and A.C. These text messages, which were on August 9 between about 1:23 p.m. and 2:33 p.m., show A.C. providing A.P. with M. COLEMAN's iCloud login and password, and A.C. asking for "any updates on Matt's location" with A.P. responding, "It looks like he is at the border."

them. So many crazy thoughts going through my head right now, hard to explain. Yeah, funny your getting some clarity through my grandmas old bibles. Wasn't there 2? Anyways, was actually still thinking of burning them in case theres a chip in them or something. Going to keep processing through everything and hope to get some answers. Hope all this craziness ends soon. Love you."

7.    A.P. and T.C. also showed Det. Davis and DAI Aijian responsive text messages from A.C. to M. COLEMAN asking if her children were okay, as well as a message from A.C. to M. COLEMAN on August 9 at 9:24 a.m., stating: "We are doing this together babe.  Praying for clarity over you and your mind this morning. Everything you've believed and known to be true is happening right now.  I'm partnering with you from SB.  Let's take back our city.  The gateway of revival for the state of California and the nation and the world.  You were created to change the course of world history.  Take care of my little giant slayer and my the voice of heaven's dove.  They sure are special."

8.    Sgt. Larson thereafter seized the MacBook, and law enforcement obtained search warrants for the MacBook.

9.    At approximately 1:00 p.m., on August 9, M. COLEMAN arrived at the SYPOE in the Mercedes Sprinter van.  M. COLEMAN was referred to Secondary Inspection.  There were no other occupants in the Mercedes Sprinter van.  Federal agents took custody of the Mercedes Sprinter van.  That same day, a Mexican liaison partner with the Secretaria de Seguridad Publica Municipal de Rosarito relayed to FBI Supervisory Special Agent

5

Joyce Deniz that they had located two deceased children matching R.C.'s and K.C.'s descriptions in a ditch at approximately 8:00 a.m. on August 9.

### C.   M. COLEMAN Is Interviewed at the SYPOE and Discusses, Among Other Things, Instagram.

10.   Later that day, M. COLEMAN was interviewed by FBI SA Nathaniel Dingle, during which time SA Dingle read M. COLEMAN his <u>Miranda</u> rights and M. COLEMAN waived his rights and agreed to speak with agents.  I reviewed the video recorded interview during which time M. COLEMAN made, among others, the following statements:

a.   M. COLEMAN confessed to killing his children, R.C. and K.C.  M. COLEMAN said that he drove his children to Mexico on Saturday, August 7, 2021.  M. COLEMAN said that he believed his children were going to grow into monsters so he had to kill them.  At approximately 5:00 a.m., on August 9, M. COLEMAN drove south on Descanso Road.  He pulled off to the side of a road in the area of Rancho Del Cielo.  M. COLEMAN stated that first he killed R.C., using a spear fishing gun that pierced R.C. in the heart.  After he killed his children, M. COLEMAN said that he moved their bodies approximately 30 yards away and placed them in some brush.[3]  M. COLEMAN stated that he drove a couple of miles where he then discarded the spear fishing gun and bloody clothes near a creek.  He threw bloody

---

[3] M. COLEMAN provided agents with the approximate location of the bodies, which coincided with where the bodies were located by Mexican authorities.

clothes into a blue trash bin somewhere off the side of a road in Tijuana, Mexico.

      b.    M. COLEMAN said that five or six days ago he started noticing strange coincidences.  He discussed QAnon[4] and Illuminati conspiracy theories as well as Strong's numbers (an index of every word in the Bible).  He said visions and signs revealed that his wife, A.C., possessed serpent DNA (M. COLEMAN mentioned that he was not sure if his wife was a shape shifter) and had passed it onto his children and that all things were pointing to the idea that his children have corrupted DNA that will spread if something is not done about it.  M. COLEMAN explained that he was either crazy or the only person that is left on Earth that is a true man, and that while he was in Mexico – before killing his children – M. COLEMAN laid in bed seeing all the pieces being decoded like "The Matrix," and he was Neo.[5]  M. COLEMAN also discussed time travel, teleportation, R.C. and K.C. telling him about babies being placed in fireworks, food, and walls.  M. COLEMAN explained that his children were communicating with him; that K.C. told him that A.C. and a family friend were abusing K.C. and R.C.; and that eventually M. COLEMAN saw the big picture that he had to kill his children to prevent them from becoming an alien species that would release carnage over the Earth.

---

    [4] M. COLEMAN mentioned during the interview that "Q" was actually talking to him.

    [5] "The Matrix" is a science fiction film. Neo is the lead character.

c.     During the interview, M. COLEMAN showed the interviewing agents several hand signals or signs that M. COLEMAN said were an indication that someone was a part of the conspiracy and showing their allegiance.  M. COLEMAN then explained that he scrolled through Instagram and took screenshots of individuals making these hand signals or signs. M. COLEMAN explained that he does not use Facebook anymore, but had recently searched through his friend, A.M.'s, Facebook account and saw a posted photograph of A.M. making one of the gestures over his eye.  M. COLEMAN showed agents the hand gesture.  According to M. COLEMAN, after seeing A.M.'s posting with the hand gesture, M. COLEMAN knew that the "whole thing was a setup" and "they" were using people to get to M. COLEMAN.

d.     M. COLEMAN identified and initialed photographs of R.C.'s and K.C.'s dead bodies as his children.

e.     M. COLEMAN said he knew what he did was wrong, but it was the only course of action that would save the world.

f.     M. COLEMAN signed a consent form allowing the FBI to search his iPhone and provided the passcode.

**D.    M. COLEMAN Makes Additional Statements About Instagram, Religion, and Conspiracies.**

11.   On August 10, 2021, while I was transporting M. COLEMAN to the Santa Ana jail, M. COLEMAN discussed his religious beliefs, work as a pastor, Nephilim, and the biblical story of Abraham sacrificing his son Isaac.  Also, on August 10, while SA Bannon and I were transporting M. COLEMAN to the Ventura County jail, M. COLEMAN said that about five days before

8

he left for Mexico, he started to get clarity.  M. COLEMAN said he saw messages on Instagram that were showing hand signs, proving "they" were targeting M. COLEMAN, and M. COLEMAN began to understand what those messages meant.

12.  On August 11, while I was transporting M. COLEMAN from Ventura County Jail to the United States Marshals Service, he explained that he first learned of "Lizard People" on Twitter and from "that British guy with white hair."[6]

### E.   A.C. is Interviewed at the SYPOE and Discusses, Among Other Things, Instagram.

13.   On August 9, 2021, after M. COLEMAN had entered the SYPOE without his children, FBI SA Zachary Schaefer and SA Jesse Chappell conducted a Mirandized interviewed of A.C.  I reviewed the recording of that interview and observed the following:

a.    A.C. explained that she and her husband were researching QAnon, and M. COLEMAN became significantly more paranoid that people around him were involved in a conspiracy. A.C. said that M. COLEMAN started doing a lot of research on leaders running "the church" and found that they may have been part of the conspiracy.  A.C. explained that M. COLEMAN began seeing "signs" in people's social media posts, and M. COLEMAN believed he was able to connect the people running "the church" to people in their community and to some of their best friends.

_____

[6] I believe, based on my investigation of this case, "that British guy with white hair" refers to David Icke, a British conspiracy theorist with white hair, who has published several books, including "Children of the Matrix" which describes, among other things, "Nefilim," "interbreeding [] between the reptilians and the blond-haired, blue-eyed, Nordic peoples," "reptilian DNA," and "'royal' bloodlines[ of] the reptilian-Nordic hybrids," and their relation to the "Illuminati."

A.C. said that M. COLEMAN found information on their friends' Instagram accounts that M. COLEMAN believed showed that they were "all in this thing together."  M. COLEMAN even accused A.C. of being a part of the conspiracy.

**F.   M. COLEMAN's and A.C.'s Communications On and About Instagram.**

14.   Pursuant to a federal warrant, I reviewed M. COLEMAN's iPhone, which had been seized at the SYPOE, and found the following:

a. Between October 1, 2018 and August 9, 2021, M. COLEMAN exchanged over 400 direct messages using SUBJECT ACCOUNT 1 (which appears to be M. COLEMAN's personal Instagram account) and SUBJECT ACCOUNT 2 (which appears to be M. COLEMAN's business Instagram account) with approximately 60 different Instagram users.[7]

b. From SUBJECT ACCOUNT 1, for example, on August 6, 2021, the day before M. COLEMAN took his children to Mexico, he exchanged four Instagram direct messages with "L.A."  L.A. asked M. COLEMAN if "you guys" wanted to do a photo session.  M. COLEMAN thanked L.A. and stated he had just had a photo shoot. Additionally, SUBJECT ACCOUNT 1 exchanged approximately 10 Instagram direct messages between May 19, 2021 and July 3, 2021, with an Instagram account that I believe to be a personal account belonging to A.C. ("A.C.'s Instagram Account"),[8] but I

---

[7] Further explanation of the identification of these accounts is set forth, *infra*.

[8] The basis for my identification of A.C.'s Instagram Account belonging to A.C. is set forth, *infra*.

was not able to see the content of those messages on M. COLEMAN's iPhone.

      c. From SUBJECT ACCOUNT 2, for example, between July 20, 2021 and July 27, 2021, M. COLEMAN exchanged approximately 10 Instagram direct messages with Instagram user "F.J."  SUBJECT ACCOUNT 2 sent multiple photos to F.J. that I am unable to see. F.J. responded to SUBJECT ACCOUNT 2 by writing, "Thanks so much! This is going to get them pumped for Thursday and hopefully more days/years to come!!!"  Based on the content of other messages in the exchange, and the fact that SUBJECT ACCOUNT 2 is used as M. COLEMAN's business Instagram account, I believe that F.J. was talking to SUBJECT ACCOUNT 2 about the surf business or surf lessons.

      d.  In addition to Instagram direct messages on SUBJECT ACCOUNTS 1 and 2, I also saw several text messages between M. COLEMAN and others that included links to Instagram posts.  For example, on July 20, 2021, A.M. sent M. COLEMAN a text message with a link to an Instagram account that appears to belong to the United States Marine Corps.  The image depicts a Marine in his camouflage uniform.  The caption reads, "The calm before the storm."  That phrase, while common, also is often used by QAnon followers.  In reviewing that Instagram post, I found in the comments section that other Instagram users posted QAnon related comments such as, "WWG1WGA," – which means "Where we go one, we go all" – as well as "TRUMP 'Q.'"

11

e. On August 3, 2021, A.C., who was listed in M. COLEMAN's phone as "[A.] Wifey"[9] sent the following Instagram screenshots to M. COLEMAN via text message:

 

I know, based on my research and investigation of this case, that these images depict Candace Owens, a popular conservative commentator.  According to my review of Instagram,

_____

[9] The phone number associated with "{A.] Wifey" on M. COLEMAN's phone matches the number on the iPhone that was seized from A.C. at the SYPOE on August 9, 2021 and that I have searched pursuant to a federal warrant.

"eyesontheright5.0" – which is the Instagram handle associated with the screenshots A.C. sent to M. COLEMAN on August 3, 2021, *supra* paragraph 14.e., – writes in its Instagram header "I post on my eyesontheright4.0[]" and "This is my backup." Additionally, "Eyesontheright4.0" writes in its Instagram header "Symbolism is the language of the satanic elite."

15.     In addition to Instagram direct messages and text messages about Instagram that I found on M. COLEMAN's and A.C's iPhones, during my review of M. COLEMAN's iPhone, I found numerous screenshots of other people's Instagram posts in which people are posing while making some type of hand gesture.

        a.     For example, I found a screenshot that was created on July 31, 2021, of a musician.  The Instagram post by musician was dated April 3, 2017, and it is a picture of the musician holding up three fingers.  Another example I found was a screenshot of an Instagram post that was created on August 6, 2021. The screenshot depicts a woman and young boy holding up two fingers, making the "peace" sign.

### G.     M. COLEMAN's Friend, A.M., Discusses M. COLEMAN's Use of Instagram.

16.     On August 20, 2021, M. COLEMAN's friend A.M., was interviewed by SA Bannon and me.  During the interview, A.M., told us the following:

        a.     M. COLEMAN started noticing "signs" everywhere, including postings on Instagram from musicians, teachers, and his friends.  M. COLEMAN took notice of symbols he saw in photographs.  Approximately three weeks before M. COLEMAN left

for Mexico, M. COLEMAN started asking A.M. about these photographs and the hand gestures and symbols depicted in the photographs.  M. COLEMAN stated the people in the photographs making these signs were evil, disguised as good, therefore these people were "compromised."  A.M. also said that on August 5, 2021, two days prior to M. COLEMAN taking his children to Mexico, M. COLEMAN began showing A.M. screenshots from Instagram of A.M.'s closest friends making hand gestures such as peace signs.  M. COLEMAN accused A.M. of being a "loyalist," which was why A.M. could not see that he was being controlled.

b.   Within hours of M. COLEMAN taking his children to Mexico, A.C. called A.M., and A.M. went to the Coleman Residence.  A.C. showed A.M. a Facebook photograph of A.M and his friends when A.M. was approximately 13 years old (making the photograph over 10 years old).  The photograph depicted A.M. and his friends making hand gestures.  Based, at least in part, on these hand gestures, A.M. said that A.C. accused him of "being in on it" and eventually A.C. chased A.M. out of the Coleman Residence.

**H.   Identification of SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, AND A.C.'s INSTAGRAM ACCOUNT.**

17.   After M. COLEMAN's arrest, FBI personnel conducted an open-source search through the Internet for Instagram accounts associated with M. COLEMAN and located SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2.

18.   Law enforcement identified SUBJECT ACCOUNT 1 ("matthewtaylorcoleman") by matching the name "Matthew Taylor

Coleman" and the profile photograph, which shows a picture of M. COLEMAN.  Additionally, law enforcement identified SUBJECT ACCOUNT 2 ("lovewater_surf") by matching the name of COLEMAN's business, LoveWater Surf.  Law enforcement agents and officers investigating this case learned the name of M. COLEMAN's business during their interviews and investigation.  For example, agents have interviewed several employees at Lovewater Surf who indicated M. COLEMAN owned the business.  Additionally, the public profile portion of a Facebook account that I believe was a personal account of M. COLEMAN's (it has the name "Matthew Taylor Coleman" and a photograph that matches M. COLEMAN) states that M. COLEMAN is the "Founder at Loverwater Surf School." SUBJECT ACCOUNT 1, which also contains the name, "Matthew Taylor Coleman," has a link in the profile section to lovewatersurf.com.  I also believe M. COLEMAN exclusively or primarily operated SUBJECT ACCOUNT 2 because (1) the business is a relatively small surfing school, and several employees were temporary or seasonal; (2) none of the employees that agents have interviewed described their duties as marketing or managing social media accounts; (3) in reviewing M. COLEMAN's digital devices, agents have not found any communications with, or indication he employs, a social media manager or marketing arm; (4) M. COLEMAN appeared to control other digital platforms used as part of the business, including FareHarbor (a business management software platform that M. COLEMAN accessed from his digital devices and which was used to run all aspects of the business); (5) M. COLEMAN's iPhone had several Instagram direct

15

messages to and from SUBJECT ACCOUNT 2; and (6) M. COLEMAN's
digital devices contained several photos, videos, and URLs
related to the Lovewater Surf School.

19.   After M. COLEMAN's arrest, investigators conducted an
open-source search through the Internet for Instagram accounts
associated with A.C. and located A.C.'s Instagram Account. The
account had A.C.'s name and a profile photograph that depicted
A.C.

20.   The FBI has sent letters to Meta requesting it
preserve the contents of the SUBJECT ACCOUNTS, most recently on
January 25, 2022 (SUBJECT ACCOUNT 1 was first preserved on
August 9, 2021, SUBJECT ACCOUNT 2 on August 12, 2021).

### III.  TRAINING AND EXPERIENCE REGARDNG INDIVIDUALS WHO COMMIT VIOLENT CRIMES AND THE USE OF SOCIAL MEDIA BY THOSE WHO BELIEVE IN OR PARTICIPATE IN CONSPIRACY THEORIES.

21.   Based on my training and experience and my
discussions with other law enforcement personnel, I know that
some people who are arrested for violent crimes will feign
mental illness (i.e., engage in malingering behavior) whereas
others may suffer from legitimate mental illness.  One way to
determine if a person has a legitimate mental illness or is
malingering, or to determine the extent to which a person
understood the nature of their actions, is to examine their
conduct and communications with others in the time around and
leading up to specific events.  For that reason, I believe an
examination of M. COLEMAN's social media content and
communications will help establish his true mental state leading

up to and around the time of the murders, as well as his mental
state in relation to R.C., K.C., and A.C.

22.     Additionally, based on my training and experience
and my discussions with other law enforcement personnel, I know
that people who participate in and believe in conspiracy
theories, such as QAnon or Illuminati, will often find like-
minded individuals through online groups that are hosted on
various social media platforms like Facebook, Instagram, and
Twitter.  I also know, based on my training and experience and
discussions with other law enforcement personnel, that
individuals who participate in and believe in conspiracy
theories, such as QAnon or Illuminati, will often communicate
with other like-minded individuals on social media platforms
such as Facebook, Instagram, and Twitter as well as through
encrypted chat platforms such as WhatsApp, Signal, and Telegram.

**IV. <u>TRAINING AND EXPERIENCE REGARDING INSTAGRAM/META</u>**

23.     Instagram is a service owned by Meta, a United
States company and a provider of an electronic communications
service as defined by 18 U.S.C. §§ 3127(1) and 2510.
Specifically, Instagram is a free-access social networking
service, accessible through its website and its mobile
application, that allows subscribers to acquire and use
Instagram accounts, like the target account(s) listed in
Attachment A, through which users can share messages,
multimedia, and other information with other Instagram users and
the general public.

24.  Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

25.  Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

26.  Each Instagram account is identified by a unique username chosen by the user.  Users can change their usernames whenever they choose, but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

27.  Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an

image uploaded to Instagram to a connected Twitter account or
post it to a connected Facebook account or transfer an image
from Instagram to a connected image printing service.  Meta
maintains records of changed Instagram usernames, associated
Instagram accounts, and previous and current connections with
accounts on Meta and third-party websites and mobile apps.

28.  Instagram users can "follow" other users to receive
updates about their posts and to gain access that might
otherwise be restricted by privacy settings (for example, users
can choose whether their posts are visible to anyone or only to
their followers).  Users can also "block" other users from
viewing their posts and searching for their account, "mute"
users to avoid seeing their posts, and "restrict" users to hide
certain activity and prescreen their comments.  Instagram also
allows users to create a "close friends list" for targeting
certain communications and activities to a subset of followers.

29.  Users have several ways to search for friends and
associates to follow on Instagram, such as by allowing Meta to
access the contact lists on their devices to identify which
contacts are Instagram users.  Meta retains this contact data
unless deleted by the user and periodically syncs with the
user's devices to capture changes and additions.  Users can
similarly allow Meta to search an associated Facebook account
for friends who are also Instagram users.  Users can also
manually search for friends or associates.

30.  Each Instagram user has a profile page where certain
content they create and share ("posts") can be viewed either by

19

the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

31.  One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

32.  Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

33.  An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames

of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

34.  Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

35.  Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

36.  Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information,

billing records, and transactional and other information when these services are utilized.

37. Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

38. Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

39. Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

40. In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of

22

contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41.  For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

### V.  PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

42.  Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.  The personnel of Meta are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of Meta for the relevant accounts and then to analyze the contents of those accounts on the premises of Meta.  The impact on Meta's business would be disruptive and severe.

43.  Therefore, in order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Meta, to protect the privacy of Meta's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the FBI seeks authorization to allow Meta to make a digital copy of the entire contents of the SUBJECT ACCOUNTS.  That copy will be provided to me or to any authorized federal agent.  The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to

Attachment B.  Relevant electronic records will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

44.  Analyzing the data to be provided by Meta may require special technical skills, equipment, and software.  It may also be very time-consuming.  Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang.  Keyword searches are further limited when electronic records are in or use foreign languages.  Certain file formats also do not lend themselves to keyword searches.  Keywords search text.  Many common electronic mail, database, and spreadsheet applications, which files may be attachments, do not store data as searchable text.  Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.  Internet Service Providers also do not always organize the electronic files they provide chronologically, which makes review more time consuming and may require the examiner to review each page or record for responsive material.

45.  Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take

24

weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within 90 days of receipt of the data from the service provider, absent further application to this court.

46.  Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic messages that identify any users of the subject account(s) and any electronic messages sent or received in temporal proximity to relevant electronic messages that provide context to the relevant messages.

47.  All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VI. CONCLUSION

48. Based on the foregoing, I request that the Court issue the proposed search warrant.

49.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or
night.

_____
JOSEPH P. HAMER
Special Agent
Federal Bureau of Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on March <u>28th</u> , 2022.

_____
~~HONORABLE xxxxxx BUTCHER~~ Michael S. Berg
United States Magistrate Judge

26

## <u>ATTACHMENT A</u>

Meta Platforms, Inc. (Meta) is an Internet Service Provider headquartered at 1601 Willow Road, Menlo Park, California 94025. Meta hosts the following electronic communication accounts that are the subject of this search warrant and application: (1) Instagram username "matthewtaylorcoleman" ("SUBJECT ACCOUNT 1"), and (2) Instagram username "lovewater_surf" ("SUBJECT ACCOUNT 2"), collectively the ("SUBJECT ACCOUNTS").

**ATTACHMENT B**

**I.**   Service of Warrant

The officer executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.**   Items to be provided by the ISP

All subscriber and/or user information and content, all electronic mail, images, text messages, direct messages, histories, searches, phone and VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following accounts and screen name(s): (1) Instagram username "matthewtaylorcoleman" ("SUBJECT ACCOUNT 1"), and (2) Instagram username "lovewater_surf" ("SUBJECT ACCOUNT 2"), collectively the ("SUBJECT ACCOUNTS").

**III.** Search of the data

The search of the data supplied by Meta pursuant to this warrant will be conducted by the FBI and any government personnel working with the FBI as provided in the "Procedures For Electronically Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of October 1, 2018 to August 10, 2021, and to the seizure of data, communications, records, or information:

  a) tending to show M. COLEMAN's, A.C.'s, R.C.'s, or K.C.'s travel inside or outside of the United States;

  b) tending to indicate M. COLEMAN's state of mind, competency, or coherence in relation to A.C., R.C., K.C., and the SUBJECT OFFENSE;

  c) tending to indicate a plan to commit the SUBJECT OFFENSE or conceal the commission of the SUBJECT OFFENSE;

  d) tending to indicate interest in QAnon, Illuminati, or conspiracy theories;

  e) about the use, purchase, or acquisition of a spear fishing gun; and

   f) tending to identify the user(s) of SUBJECT ACCOUNT 1 or
      SUBJECT ACCOUNT 2;

which is evidence of violations of Title 18, United States Code,
Sections 1119 and 1111, foreign murder of U.S. nationals.